# In the United States Court of Federal Claims

No. 07-816L
(Filed February 8, 2011)

| | |
|---|---|
| **THE GEORGE FAMILY TRUST, By and Through Its Trustees, JOHN P. GEORGE, JULIA P. PAPA, and JERRY GEORGE, Trustees,**     Plaintiff,     v. **THE UNITED STATES,**     Defendant. | Takings claims for flooding and flood damage; showing of causation; summary judgment, RCFC 56(c); inverse condemnation. |

William R. Mayo, Fayetteville, AR, for plaintiff.

Frank J. Singer, Washington, DC, with whom was Assistant Attorney General Ignacia S. Moreno, for defendant.

### MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

   Before the court is defendant's motion for summary judgment on the remaining takings claim of plaintiff, The George Family Trust ("plaintiff," or the "George Trust"). 1/ The George Trust owns water-damaged riparian properties on tributaries to the White River in Arkansas. Plaintiff alleges that, beginning in and following 2003, recurring flooding during the crop planting season of April through May, caused by the operation of upstream dams by the United States Army Corps of Engineers (the "Corps"), damaged the George Trust's crop-land and thereby constituted a taking that warrants just compensation under the Fifth Amendment to the U.S. Constitution. Defendant moves for summary judgment

---

   1/ The court will refer to plaintiff in the singular, as the trustees of the George Trust sue on its behalf.

pursuant to RCFC 56(c) for failure to make a prima facie showing of causation. The parties declined argument.

**BACKGROUND**

The court's prior opinion in this matter, George Family Trust ex rel. George v. United States, 91 Fed. Cl. 177 (2009) (order granting motion to dismiss for lack of subject matter jurisdiction on claims for taking of timber and denying motion with respect to George Trust's crop-land), detailed the factual background of this case. See George Family Trust, 91 Fed. Cl. at 181-89. Accordingly, the court incorporates by reference the undisputed background facts set forth therein and adds only those additional facts relevant to adjudicate the pending motion for summary judgment.

The George Trust is a riparian landowner whose properties border Prairie Cypress Creek, located in Monroe County, Arkansas, approximately three miles upstream from where Prairie Cypress Creek flows into Big Creek, a tributary of the White River. Prairie Cypress Creek and Big Creek meet approximately 5.5 miles upstream from the confluence of Big Creek and the White River. The Little Rock Arkansas Corps operates a series of dam-and-reservoir projects on the White River and its tributaries, located approximately 134 to 560 miles upstream from where Big Creek flows into the White River (the "Corps Projects"). 2/ The Corps's activities along the White River include operating a series of gauges that measure the elevation (or "stage") of the river's flow. See Declaration of H. Henry Himstedt, Aug. 27, 2010, ¶ 3. The St. Charles Gauge is the closest upstream gauge to the George Trust's properties, located on the White River approximately eight miles upstream from its confluence with Big Creek, and is operated by the Memphis District, Corps of Engineers. The St. Charles Gauge calculates the total flow of the White River, "including both flow attributable to natural run-off from rain falling downstream of [the] Corps'[s] dams and flow, if any, attributable to the Corps'[s] releases from its dams further upstream on the White River." Himstedt Decl. ¶ 3. Gauge records documenting the river flow are available beginning in June 1932. Id.

The George Trust and The Elizabeth Stone Trust (the "Stone Trust") filed separate complaints in the United States Court of Federal Claims on November 26, 2007, alleging that the Corps Projects in the White River resulted in a taking by innundation of their timber. The cases were consolidated on March 20, 2008. On December 22, 2008, the George Trust amended its complaint, adding a claim for a taking of its crop-land. Plaintiff alleges that the Corps Projects caused flooding of the George Trust's crop-land, thereby effecting a taking

---

2/ The Corps Projects encompass six dams in the White River basin: the Beaver, Table Rock, Bull Shoals, Norfork, Greers Ferry, and Clearwater dams. See Declaration of H. Henry Himstedt, Aug. 27, 2010, ¶ 2.

of its properties. See Am. Compl. filed Dec. 22, 2008, ¶¶ 7-10.  Plaintiff claims that its properties, "over a period of time[,] [have] been subjected to gradual, periodic and intermittent flooding from backwater from Big Cypress Creek," id. ¶ 7, that has rendered "some 65 acres of Plaintiff's land unusable as croplands[,] denying Plaintiff of [the lands'] economic viable use," id. ¶ 9.  The George Trust's losses are a "direct and proximate result of the gradual, periodic and intermittent flooding caused by the Defendant through the U.S. Corp[s] of Engineers' use of flood control devices and procedures on the Arkansas River System." Id. ¶ 10.

Defendant moved to dismiss the Stone Trust's complaint and the George Trust's amended complaint as time-barred under 28 U.S.C. § 2501 (2006). George Family Trust, 91 Fed. Cl. at 189. Defendant also argued that the George Trust's crop-land claim had no merit, which the court treated as a motion to dismiss for failure to state a claim upon which relief can be granted. See id. The court granted defendant's motion with respect to both plaintiffs' timber claims, see id. at 196, but held that the George Trust's claim alleging flooding of its crop-land, beginning in and following 2003, was timely, id. at 200. The court also ruled that the George Trust's crop-land claim alleged a taking sufficient to withstand defendant's RCFC 12(b)(6) motion. Id. at 203 (explaining that "[Jeff] George has described [through his affidavit] an unforeseen change in periodic flooding patterns affecting the George Trust's crop-land in 2003," and plaintiff's expert's report "plausibly suggests that crop-land flooding and damage . . . may have been a direct, natural, or probable result of the Corps Projects").

Following the opinion dismissing the timber claims, discovery was reopened. Defendant subsequently filed a motion for summary judgment, submitting with its motion expert declarations to rebut the 2008 expert report and 2009 declaration of Dr. Jerry Overton, C.P.G., President and Senior Hydrogeologist/Hydrologist for ATOKA, Inc. (the "Overton Report").  The Overton Report was proffered by plaintiff in response to defendant's prior motion to dismiss, but before the George Trust amended its complaint to include its crop-land claim. See George Family Trust, 91 Fed. Cl. at 184; Declaration of Dr. Jerry Overton, Aug. 27, 2009. 3/

The George Trust continues to rely on the Overton Report, which is limited to a "determin[ation regarding] the extent of flooding of the timbered portions of the George

---

3/  Defendant attaches excerpts of the Overton Report to its current motion for summary judgment. See Declaration of Frank J. Singer, Aug. 27, 2010, Ex. 1. The complete Overton Report to which the court cited in its prior opinion, see, e.g., George Family Trust, 91 Fed. Cl. at 184-87, was attached to defendant's 2009 motion to dismiss, see Def.'s Br. filed June 29, 2009, ECF No. 26-6. For purposes of resolving the pending dispositive motion, the court's citations to the Overton Report refer to the excerpts attached to defendant's pending motion.

3

Family Trust properties." Overton Report at 2. Although Dr. Overton's report sought to determine "the duration of flooding on the subject properties during the prime bottomland hardwood growing season, July through September," it does not discuss directly plaintiff's crop-land. Id.

The court discussed the Overton Report at length in its prior opinion. See George Family Trust, 91 Fed. Cl. at 184-87. In brief, Dr. Overton attributes flooding on plaintiff's properties to the Corps Projects, citing a March 1986 letter from Charles Baxter, Field Supervisor of the U.S. Department of Interior's Fish and Wildlife Service, to Colonel Robert Whitehead of the Corps as evidence that a majority of Big Creek's flooding is "from headwater sources, including river flow directly resulting from releases from [the Corps's] water control structures." Overton Report at 10. Dr. Overton determined that, due to overbank flooding from Prairie Cyprus Creek, the George Trust properties would flood when Prairie Cyprus Creek's elevation stage level reached 145 feet mean sea level ("msl"). Id. at 15. Because of the similar elevations between the St. Charles Gauge and Prairie Cyprus Creek, he estimated that plaintiff's properties would flood when the St. Charles Gauge recorded an elevation of 145 feet (msl). Id. However, Dr. Overton also warned that "due to the generally level terrain, it is likely that the George Family Trust properties begin to flood prior to the St. Charles stage reaching elevation 145 (msl)." Id. Based on a review of the St. Charles Gauge's stage data dating from 1932 through 2007, Dr. Overton concluded that the average number of days that the St. Charles Gauge exceeded 145 feet (msl) during the months of July through September (the critical growing season for hardwood timber) was greater during years 1963 – 2007 than it was during years 1932 – 1962. Id. at 16, 19. Dr. Overton attributes the increased flooding to the Corps Projects. Id. at 19.

Aside from the Overton Report and Dr. Overton's 2009 declaration, plaintiff's only other evidence is the Declaration of Jeff George, August 28, 2009, which states:

> 6. With respect to the periodic flooding, the pattern of flooding began to change particularly with respect to the cultivated land which is subject to the Plaintiff George Family Trust's Complaint for damages in 2003 when portions of the same began to remain inundated during the planting seasons up through early summer making utilization of the crop lands impossible.
>
> 7. Prior to the 2003 crop year the farm tenant who rented the cultivated land was able to plant and harvest crops on now inundated lands without loss to the Plaintiff.

George Decl. ¶¶ 6-7.

4

The George Trust's response to defendant's motion is based upon plaintiff's pleadings and the "declarations and exhibits appended and attached to the Defendant's Motion." Pl.'s Br. filed Oct. 28, 2010, at 3. Most of the declarations and exhibits attached to defendant's summary judgment motion are duplicates from the proceedings on the 2009 motion to dismiss. Notably, defendant has included only excerpts from Dr. Overton's 2008 report. See generally Singer Decl. Ex. 1. Despite this, plaintiff states that, "for purposes of simplification," it did not duplicate or supplement any of defendant's exhibits. Pl.'s Br. filed Oct. 28, 2010, at 3. The court can only conclude that, other than the George Trust's pleadings and the exhibits attached to defendant's motion for summary judgment (which include declarations from plaintiff's witnesses and filed on its behalf), plaintiff puts forth no further evidence to rebut the showing in defendant's motion.

Defendant proffers the supplemental declaration of Paul H. Schwartz, P.E., Ph.D., a geotechnical engineer retained as an expert in connection with defendant's prior motion to dismiss. See George Family Trust, 91 Fed. Cl. at 187; Declaration of Paul H. Schwartz, Aug. 31, 2010, ¶¶ 1-2. Dr. Schwartz opines on whether the White River caused an increase in the duration of flooding on plaintiff's crop-land during the months of April through May beginning in and following 2003. Dr. Schwartz reaffirms the statement in his 2009 declaration that "there were no changes in the operation of the water control dams by the Corps between 1999 through 2008." Schwartz Decl. ¶ 2. In connection with defendant's current motion, Dr. Schwartz evaluated the relationship between the total flow of White River and alleged increases in the duration of flooding of plaintiff's properties following 2002. Id. ¶ 6. Dr. Schwartz analyzed the daily stage data from the St. Charles Gauge for the months of April through June from 1990 through 1998 and from 1999 through 2008. Id. ¶¶ 7, 9. His analysis of the data revealed that "the White River elevations were generally as high or higher between 1990 through 1998 (when [plaintiff's] land could purportedly be cultivated) than in 2003 (when the land allegedly could no longer be cultivated because of a change [in] flooding)." Id. ¶ 10. Similarly, the data revealed that "the White River elevations were generally as high or higher between 1999 through 2002 . . . than between 2003 through 2007." Id. ¶ 11. Dr. Schwartz noted an anomalous year in 2008, which he attributed to a period of "abnormally heavy rainfall in the White River watershed." Id. ¶ 12 ("But the 2008 peak stage does not support the notion that the White River caused a marked increase in the duration of flooding during the planting and early summer months starting in 2003."). Dr. Schwartz concluded that "the stage data at the St. Charles gauge establish[] that there is no correlation between the total flow of the White River and . . . an increase [in flooding of plaintiff's properties] that would allow one to conclude that the total flow of the White River caused such [a] change in flooding." Id. ¶ 13.

Defendant also proffers the declaration of H. Henry Himstedt, Chief of the Hydraulics & Technical Services Branch of the Corps's Little Rock, Arkansas District, see Himstedt Decl. ¶ 1, who opined on whether the White River's total flow increased during the planting

5

season and early summer following 2002. Mr. Himstedt reviewed the findings of Dr. Schwartz and the Overton Report. Id. ¶ 5. Mr. Himstedt analyzed the daily river-stage data at the St. Charles Gauge for years 1993 through 2008, using the same data that were used by Drs. Schwartz and Overton. Id. Based on data from a table attached to the Overton Report ("Table 1"), Mr. Himstedt calculated the average number of days per month that the stage at the St. Charles Gauge crossed the 145 feet (msl) threshold for flooding the George Trust's properties from 1993 through 2002 and from 2002 through 2007. Mr. Himstedt also "reproduced the calculations [contained in the Overton Report] of the monthly average stage elevation at [the] St. Charles [Gauge] for the time period 1993 through 2002 and . . . for the time period 2003 through 2008." Id. ¶ 6. The results showed that the "monthly average stage at [the] St. Charles [Gauge] decreased during 2003 through 2008 compared to the same average for the time period 1993 through 2002 for all months, except September, November and December." Id. ¶ 7. A chart summarizing his findings is attached as exhibit 2 to Mr. Himstedt's declaration. See id. Ex. 2.

**DISCUSSION**

I. Standard of review

1. Summary judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Centillion Data Sys., LLC, v. Qwest Commc'ns Int'l, Inc., No. 10-1110, 2011 WL 167036, at *3 (Fed. Cir. Jan. 20, 2011). On a motion for summary judgment, the court views the evidence "in the light most favorable to the party opposing the motion," and resolves all doubts in favor of the nonmovant. Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002); see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc., 555 F.3d 984, 991 (Fed. Cir. 2009). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. See Anderson, 477 U.S. at 255. With regard to takings cases, "due to the fact-intensive nature . . . summary judgment should not be granted precipitously." Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005).

As the moving party, defendant "has the burden to show 'that there is an absence of evidence to support the non-moving party's case.'" Crown Operations, 289 F.3d at 1377 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The moving party may submit sworn affidavits in support of its motion. See RCFC 56(c)(1), (e). Once the moving party has met its burden, the party opposing summary judgment must respond and "set out specific

6

facts showing a genuine issue for trial." RCFC 56(e)(2); see also Crown Operations, 289 F.3d at 1377 (explaining that non-moving party's response must "affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial"). The non-moving party's burden requires more than "mere assertions" or "conclusory pleadings." Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626-27 (Fed. Cir. 1984); see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984) ("The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.").

However, the "non-movant need not always provide affidavits or other evidence to defeat a summary judgment motion. If, for example, the movant bears the burden [of proof] and its motion fails to satisfy that burden, the non-movant is 'not required to come forward' with opposing evidence." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970)). Thus, under Rule 56(e), a non-movant must provide "opposing evidence . . . only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Id. at 1369; see also Zenith Elecs. Corp. v. PDI Commc'n Sys. Inc., 522 F.3d 1348, 1363 (Fed. Cir. 2008).

The United States Supreme Court has clarified that the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." Anderson, 477 U.S. at 247-48. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A fact is material if, under the applicable law, it could change the outcome of any legal conclusions, "such that a finding of that fact is necessary and relevant to the proceeding." Crown Operations, 289 F.3d at 1375.

2. Plaintiff's takings claim

The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Court of Federal Claims has jurisdiction over claims brought against the United States alleging a taking in violation of the Fifth Amendment. See 28 U.S.C. § 1491(a)(1) (2006) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ."). "A taking occurs when governmental action deprives the owner of all or most of its property interest." Nw. La. Fish & Game Pres. Comm'n v. United States, 446 F.3d 1285, 1289 (Fed Cir. 2006) (citing United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945)). In certain circumstances, a taking due to flooding can result from the Government's construction of a dam. See id. ("For example, '[w]here the government by the construction of a dam or other public works so

floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the Fifth Amendment.'" (alteration in original) (quoting United States v. Lynah, 188 U.S. 445, 470 (1903), overruled on other grounds by United States v. Chi., Mil., St. Paul & Pac. R.R. Co., 312 U.S. 592 (1941))).

Because the George Trust does not allege that the taking was the result of the Government's formal exercise of its powers of eminent domain, plaintiff's claim is one for "inverse condemnation." See Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing Moden, 404 F.3d at 1342). To succeed on its claim, plaintiff must satisfy the two-prong test of causation and appropriation set forth by the United States Court of Appeals for the Federal Circuit in Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355-56 (Fed. Cir. 2003). First, plaintiff must show that the Corps intended "to invade a protected property interest or the asserted invasion is the 'direct, natural or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" Id. at 1355 (quoting Columbia Basin Orchard v. United States, 132 F. Supp. 707, 709 (Ct. Cl. 1955) ("There must have been an intent on the part of the defendant to take plaintiff's property or an intention to do an act the natural consequence of which was to take its property.")); see also Bartz v. United States, 633 F.2d 571, 577 (Ct. Cl. 1980) ("The United States is not liable for flood damages unless directly attributable to governmental action. Indirect or consequential damages are not compensable."). Second, plaintiff must show that the invasion "appropriate[d] a benefit to the government at the expense of the property owner, or at least preempt the owners [sic] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, 346 F.3d at 1356. To satisfy this prong, the court must determine whether the "government's interference with any property rights of [plaintiff] was substantial and frequent enough to give rise to the level of a taking." Id. at 1357.

Defendant challenges the George Trust's ability to meet the first Ridge Line prong—a direct, natural, or probable result of an authorized activity. The Federal Circuit has clarified that, while "causation must be shown," Moden, 404 F.3d at 1343, "proof of causation . . . is not sufficient for liability in an inverse condemnation case," id.; the "resulting injury must also be foreseeable from the authorized government act," id. (explaining that "direct, natural, or probable result" means that an "inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury"). In order for a compensable interest to be established, "the court must determine that no break in the chain of causation existed between the suspected government authorized action and the injury." Cary, 552 F.3d at 1380.

II. Defendant's showings in support of summary judgment

    1. The parties' positions

Defendant argues that, because "the only Corps actions at issue in this case relate to its operation" of the Corps Projects, any "increased flooding on Plaintiff's crop lands could only be caused by the Corps if its operations of those dams directly caused flows in the White River near Plaintiff's properties to increase in 2003 and after." Def.'s Br. filed Aug. 27, 2010, at 4. Based on the findings of Dr. Schwartz, defendant challenges the George Trust's evidence that any increase in the duration of flooding is attributable to the Corps Projects. Specifically, defendant cites Dr. Schwartz's conclusion that there was "no evident increase in the flows of the White River that would correlate to Mr. George's attested increase in the duration of flooding during the planting season and early summer." Id. at 16 (citing Schwartz Decl. ¶ 13).

Similarly, defendant advances the findings of Mr. Himstedt that "for the months January through August, the average daily elevation of the White River at the gauge closest to Plaintiff's properties *decreased* during the 2003 through 2008 period." Id. at 14 (citing Himstedt Decl. ¶ 6, Ex. 2). Therefore, plaintiff cannot establish that any water released by the Corps caused an increase in flooding of its properties "during the planting season and early summer starting in and following 2003, because the evidence shows that the average daily *total* elevation of the White River *decreased* between January through August . . . at the gauge closest to Plaintiff's property." Id. at 14-15. Further, defendant points to Mr. Himstedt's analysis of Dr. Overton's Table 1, which listed the number of days each month that the stage at the St. Charles Gauge exceeded 145 feet (msl). Id. at 15. When Mr. Himstedt compared the stage at the St. Charles Gauge between 1993 through 2002 with 2003 through 2007, the results showed that "for the months February through October the average number of days per month that the elevation at St. Charles exceeded 145 feet above mean sea level *decreased* during the 2003 through 2007 period." Id. (citing Himstedt Decl. ¶ 5, Ex. 3). Defendant submits that this result fatally undermines any causal link between an increase in the duration of flooding of the George Trust's crop-land and the Corps's actions on the White River. Id.

Defendant also challenges the George Trust on its lack of evidence to establish a connection between the Corps's activities and increased flooding on plaintiff's crop-land. Defendant contends that plaintiff does not "point[] to [any] activity by the Corps starting in and following 2003," and does not offer any "expert opinion linking the Corps'[s] actions on the White River to Mr. George's declared increase in the duration of flooding." Id. at 13. Rather, according to a 2009 declaration from Dr. Overton, plaintiff "concedes that the Corps'[s] operation of dams in the White River basin has been consistent for several years prior to 1999." Id. (citing Overton Decl. ¶ 7).

9

Defendant disputes that plaintiff can create a genuine issue of material fact that the White River caused an increase in flooding of plaintiff's properties beginning in and following 2003 based on the opinions of Dr. Overton and Mr. George. Dr. Overton's declaration and his report were directed to the original two trust plaintiffs' timber claims and are "irrelevant in addressing the cause of any alleged increase in the duration of flooding of Plaintiff's crop lands." Id. at 18. "Dr. Overton's 2008 expert report offers no opinion or analysis on whether there was a change in the flow of the White River starting in 2003 that explained the increase in the duration of flooding alleged in Mr. George's August 28, 2009 declaration." Id. at 17. Defendant cites the Federal Circuit's admonition in Sitrick v. Dreamworks, LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008), that "[c]onclusory expert assertions cannot raise triable issues of material fact on summary judgment," to assert that Dr. Overton's opinion—that "the portion of the White River's total flow attributable to the Corps'[s] release from dams in the White River basin is a substantial cause of flooding of plaintiff's crop lands"—is "conclusory." Id. at 19 (citing Overton Decl. ¶ 7). Moreover, Dr. Overton's opinion is contradicted by defendant's evidence showing that the river's average daily elevations and the average number of days that the elevation exceeded 145 feet (msl) for the relevant time period decreased. Id. Finally, defendant argues that Mr. George's 2009 declaration merely asserts that flooding did not recede on plaintiff's crop-land and does not supply any "evidence or theory as to how that alleged increase in the duration of flooding could be tied to actions of the Corps on the White River." Id. at 19-20 ("'[P]roof of damage alone does not necessarily prove a taking.'" (alteration in original) (quoting Loesch v. United States, 645 F.2d 905, 914 (Ct. Cl. 1981))).

The George Trust responds that genuine issues of material fact remain to be tried based on plaintiff's denials of defendant's assertions: (1) the "Corp[s's] release of water from dams in the White River basin have been consistent since 1999," Pl.'s Br. filed Oct. 28, 2010, at 3 (citing Singer Decl., Exs. 1, 2; Overton Decl.); and (2) the average daily elevations of the White River decreased during the planting seasons of 2003 through 2008 compared to the same period from 1993 through 2002, id. Plaintiff concedes its burden to "demonstrate that the government's actions were the 'direct and proximate cause' of the harm[] to its property interest." Id. at 4-5 (citing Loesch, 645 F.2d at 913). However, the George Trust clarifies that its crop-land takings claim is "based on the allegation of increased flooding during the planting season following 2003. The planting season is from mid-April to mid-May." Id. at 5.

Plaintiff chides defendant for "statistically stretching what they would argue is the relevant period into nine month[s] (February through October) rather than two months (mid April/mid May)," thereby ginning-up "the artificial argument that flooding has actually decreased since 2003." Id. Appealing to common sense, plaintiff argues that the findings of Dr. Schwartz and Mr. Himstedt ignore "the reality of the required time window of planting" crops: once "flood waters are present up to and including the closing of the [time]

10

window for planting, there will be no crop to harvest even if the average days per month from June to October reflect less times when the White River exceeded 145 feet [(msl)] when flooding occurs." Id. at 6. Instead, the focus should be on the flood levels during the days between April and May—"the actual periods of time when the ground is prepared for planting." Id. ("Even a crop planted in mid April that is subsequently flooded in May will not generate a harvest in October.").

    2. Defendant's discharge of its burden on summary judgment

The George Trust's characterization of the data relied on by defendant's experts does not withstand scrutiny. Plaintiff charges that Mr. Himstedt and Dr. Schwartz ignore the post-2002 flooding during the months of April and May captured in Dr. Overton's Table 1. As recorded in Dr. Overton's Table 1 for the years 2003 through 2007, plaintiff emphasizes that "only the month of May 2005 reflected less that [sic] 24 days out of 30 where the stage at the St. Charles [G]auge exceeded 145 feet." Id. at 6. This statement is false. The relevant portions of Dr. Overton's Table 1 set forth the following information: 4/

Table 1
1963-2007 Number of Days Each Month Stage at St. Charles is Greater Than Elevation 145 (FMSL)

| [Year] | April | May | [Year] | April | May | [Year] | April | May |
|---|---|---|---|---|---|---|---|---|
| 1993 | 30 | 31 | 1998 | 30 | 31 | 2003 | 0 | 24 |
| 1994 | 30 | 31 | 1999 | 30 | 31 | 2004 | 18 | 31 |
| 1995 | 30 | 31 | 2000 | 0 | 0 | 2005 | 30 | 12 |
| 1996 | 16 | 31 | 2001 | blank | blank | 2006 | 5 | 24 |
| 1997 | 30 | 31 | 2002 | 30 | 31 | 2007 | 28 | 30 |

Singer Decl. Ex. 2. As reflected in Table 1, Dr. Overton's records for the years 2003 through 2007 reveal that, in addition to May 2005, the months of April in 2003, 2004, and 2006 show fewer than twenty-four days out of thirty "where the stage at the St. Charles Gauge exceeded 145 feet." Id. Moreover, a comparison between years 1993 through 2002 and years 2003 through 2007 supports defendant's assertion that, during the months of April and May, the number of days that the stage at the St. Charles Gauge was greater than 145 feet (msl) decreased during the 2003 through 2007 time period.

---

    4/ This is a compressed version. Only the years and months relevant to defendant's motion are listed.

11

Defendant correctly distills the George Trust's ultimate burden to prove that the White River's elevation increased starting in and following 2003, "thereby causing an increase in the elevations of Big Creek and, in turn, Prairie Cypress Creek (i.e., a backwater effect)," and that the Corps is responsible for the White River's increased elevation. Def.'s Br. filed Nov. 12, 2010, at 1. Defendant also has established that the George Trust has not met its burden. Through the opinions of Dr. Schwartz and Mr. Himstedt, defendant shows that the elevation of the White River decreased following 2002. Following defendant's motion, it was incumbent upon plaintiff to rebut defendant's showing by "'point[ing] to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail,'" Processed Plastics Co. v. United States, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (quoting Barmag, 731 F.2d at 836), and not to rely on mere assertions. Plaintiff failed to discharge its assignment. See RCFC 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party . . . must . . . set out specific facts showing a genuine issue for trial."). Indeed, the George Trust undermines its case by relying on Dr. Overton's 2008 report. As discussed above, Dr. Overton's Table 1 demonstrates that the White River's daily elevations for April and May decreased after 2002. See Singer Decl. Ex. 2. A party cannot defeat summary judgment by "instigating controversy with one's own position on the facts." Sohm v. United States, 3 Cl. Ct. 74, 77-78 (1983).

Plaintiff's contention that the data relied on by defendant are based on "a nine month average" is understandable, but mistaken nevertheless. Pl.'s Br. filed Oct. 28, 2010, at 7. Defendant grouped Mr. Himstedt's findings into two time periods, each spanning eight months: the White River's average daily elevation from January through August, see Def.'s Br. filed Aug. 27, 2010, at 14, and the average number of days per month that the White River exceeded 145 feet (msl) between February and October, see id. at 15. However, Mr. Himstedt's calculations of the river's daily elevations are based on monthly averages "for each month of the year between the two time periods" and were made "independent of the average daily elevation for other months." Def.'s Br. filed Nov. 12, 2010, at 4. The data are broken down by month, and the monthly averages for April and May show decreases in the White River's daily elevation after 2002. See Himstedt Decl. Ex. 2. Correspondingly, the alleged error that plaintiff finds in Mr. Himstedt's use of Dr. Overton's Table 1 to calculate the average number of days per month that the river exceeded 145 feet (msl) from 1993 through 2002 and from 2003 through 2007 has not been shown, as each month's calculations are independent of the other months. See Def.'s Br. filed Nov. 12, 2010, at 5. The result, indeed, is unambiguous: the average number of days in April and May that the river exceeded 145 feet (msl) decreased after 2002. See Himstedt Decl. Ex. 3. Plaintiff's disagreement with this result does not convert it into a genuine issue of material fact. See Anderson, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."). The court agrees with defendant that "[t]hese findings preclude [p]laintiff from proving that the White River caused the alleged

increase in the duration of flooding of Prairie Cypress Creek." Def.'s Br. filed Nov. 12, 2010, at 5.

Similarly, Dr. Schwartz's analysis also is not based on a nine-month average. Dr. Schwartz analyzed the stage at the St. Charles Gauge during the months of April through June between 1990 through 1998 and between 1999 through 2008. See Schwartz Decl. ¶ 9. He sees "no correlation between the total flow of the White River" and an increase in flooding of plaintiff's crop-land during the planting season starting in and following 2003. Id. ¶ 13. The George Trust argues that, per Dr. Overton's declaration, Dr. Schwartz "in essence completely ignores the impact of the Corp[s] of Engineer[s's] operations above [the Georgetown, Arkansas gauging station, the first gauging station downstream of all six Corps Projects (the "Georgetown Gauge")] on the tributaries downstream, and in turn does not address its impact on the Plaintiff['s] respective properties during the growing season." Pl.'s Br. filed Oct. 28, 2010, at 7 (citing Overton Decl. ¶ 7). However, the "growing season" to which the George Trust refers is the growing season for timber—July through September—not the April-through-May crop-planting season that plaintiff alleges experienced an increase in the duration of flooding. See Overton Decl. ¶ 8. Moreover, plaintiff fails to explain how this point discredits Dr. Schwartz's analysis of the stage data at the St. Charles Gauge—which is closest to the George Trust's properties—for the months of April through June.

The only evidence relevant to plaintiff's crop-land claim that the court gleans from Dr. Overton's declaration is his following conclusion:

> When the total amount of water from the [Corps's] water control systems on the White River is added to the uncontrolled flow above [the Georgetown Gauge] and then the amount that may be added downstream of [the Georgetown Gauge], the result is periodic consecutive years of flooding of bottomland hardwoods during the prime growing season. The combination of controlled flow . . . and uncontrolled flow downstream of the Georgetown gauging station as well as backflow resulting from varying levels of the Mississippi River, results in unnatural flooding of the George Family Trust properties.

Overton Decl. ¶ 7.

In its prior opinion, the court ruled that this statement, in combination with Mr. George's declaration, stated a claim for relief sufficiently plausible to overcome defendant's RCFC 12(b)(6) motion. See George Family Trust, 91 Fed. Cl. at 202 ("Ignored by defendant, however, is the implication that the Corps's policy for controlled flow 'within the context of' uncontrolled flow has occasioned the flooding of plaintiffs' properties." (quoting Overton

13

Decl. ¶ 7)); see also id. at 202 n.25. Plaintiff's evidence, however, leaves gaping holes of logic in its chain of causation that are illuminated by the new declarations submitted by defendant. For example, plaintiff offers no explanation of how the Corps Projects caused an increase in flooding of Prairie Cypress Creek every year starting in 2003 during April and May such that it rendered plaintiff's crop-land unable to be cultivated. According to Mr. George's declaration, the crop-land was cultivated prior to 2003. See George Decl. ¶¶ 6-7. The question thus presents itself: what did the Corps do after 2002 to increase flooding that rendered the same crop-land unable to be cultivated? Plaintiff offers no answer.

Moreover, Dr. Overton's report and declaration describe neither a change in flood patterns after 2002 nor a differentiation in the release of water flows from the Corps Projects' past release levels. As is apparent from Dr. Overton's conclusion, the focus of his report and declaration was the long-term impact of continuous flooding on timber stands. See Overton Decl. ¶ 6 (describing effects of excessive flooding on bottomland hardwoods, particularly on root systems). Dr. Overton's opinions also predate the evidence submitted by defendant in support of its motion for summary judgment––much of it based on Dr. Overton's Table 1––showing that the stage at the St. Charles Gauge deceased beginning in and following 2003. The court's prior opinion inferred, for purposes of defendant's RCFC 12(b)(6) motion, that Dr. Overton's conclusion plausibly could account for flooding of the George Trust's crop-land; now, in the face of defendant's evidence on causation, the same inference is no longer plausible. Once defendant moved for and supported its motion for summary judgment, the George Trust was required to produce "specific facts" pointing to "specific evidence [that] could be offered at trial," Pure Gold, 739 F.2d at 627 ("Mere conclusory assertions do not raise a genuine issue of fact."), a burden the George Trust did not carry.

Assuming that the duration of flooding of Prairie Cypress Creek did increase after 2002, neither Mr. George's declaration nor Dr. Overton's report raise a sufficient factual issue as to whether such flooding is the "direct, natural or probable result" of the Corps Projects, and is not the "incidental or consequential injury inflicted by the action." Ridge Line, 346 F.3d at 1355 (citation omitted) (internal quotation marks omitted). Finally, the George Trust's evidence does not establish that the Corps should have foreseen the alleged flooding of its crop-land. See Moden, 404 F.3d at 1343. Defendant therefore is entitled to summary judgment. See Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004) ("'The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" (quoting Celotex, 477 U.S. at 325)).

## CONCLUSION

Defendant presents straightforward evidence showing that the White River's elevation did not increase starting in and following 2003. Thus, it is not possible for the Corps Projects

to have caused the alleged flooding of the George Trust's properties. Assuming, *arguendo*, that such an increase in the river's elevation took place, plaintiff puts forth no evidence linking it to the Corps Projects. Neither the opinion of Dr. Overton nor the asseverations of Mr. George are sufficient for the George Trust to meet its burden of establishing causation. Therefore, no genuine issue of material fact is presented that must be decided at trial. In these circumstances, summary judgment for defendant is warranted.

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted, and the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED**.

No costs.

/s/ Christine O.C. Miller
_____
Christine Odell Cook Miller
Judge